## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Brian A. Bash, Trustee, | ) | **CASE NO. 5:13 CV 2371** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| Daniel S. Laikin, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

### INTRODUCTION

This matter is before the Court upon the Report and Recommendation After Trial

("R&R")(Doc. 1) filed by a Bankruptcy Judge[1] in this jurisdiction.  The Court declines to

address each and every recommendation.  Rather, the Court addresses the general arguments

raised by the parties.  For the reasons that follow, the R&R is ACCEPTED in PART and

REJECTED in PART.

### FACTS

The Court accepts the following facts as determined by the Bankruptcy Judge and to

which no objection was filed.

Fair Finance was founded by Arthur Ray Fair in 1934 and was in the business of

providing sales financing to dealers and merchants.  Historically, Fair Finance purchased

---

[1]    Judge Marilyn Shea-Stonum presided over the trial in this matter.
       She has since retired from the bench.

1

customer financing contracts from credit-worthy dealers and serviced financing contracts owned

by dealers for a fee. Fair Finance sold investment certificates of various dollar denominations to

investors who were Ohio residents in order to finance its operations. The rate of interest paid on

these investment certificates varied over time and based on the term of the certificate. On

September 9, 2008, the V-6 interest rate was 7.75%.  On September 29, 2009, the V-6 interest

rate was 7.5%.

In January of 2002, Timothy Durham purchased Fair Finance through Fair Holdings, Inc.

("FHI").  DCI Investments, LLC ("DCI"), in turn, is the sole shareholder of FHI.  Durham and

James F. Cochran have been the members of DCI since its inception. Durham was Chairman of

FHI and the Managing Member of DCI.

Defendant Laikin is an individual currently residing in California.  He is fairly

sophisticated in business matters. Laikin testified that he first met Durham in the late 1980s.

Around 2000, Durham and Laikin began doing business together.  In addition, they became

friends, traveling together on vacation with and without their families, and speaking

often.  Laikin and Durham have been involved in several businesses together, including

Fair Holdings, Fair Finance, National Lampoon, Inc. ("National Lampoon"), and Obsidian

Enterprises, Inc. ("Obsidian").  Laikin lent $1.7 million to assist Durham in raising the capital to

purchase Fair Finance.  Laikin was repaid fairly quickly and, from 2006-2008, Laikin was a

director of Fair Finance.

Laikin and Durham controlled National Lampoon.  Both were directors of the corporation

and Laikin acted as CEO of National Lampoon until he was indicted for securities fraud.  Laikin

eventually plead guilty to conspiracy to commit securities fraud to manipulate the stock price of

National Lampoon.  A criminal judgment was entered against Laikin and he was imprisoned.

Durham replaced Laikin as CEO of National Lampoon.  Laikin, however, remains a majority

shareholder of National Lampoon.

On August 8, 2002, Laikin executed a "Secured Promissory Note (Line of Credit)"

("Note") with DCI, which was expressly amended a number of times.  As a result of the various

amendments, the terms of the Second Amended Promissory Note (Line of Credit) generally

govern the substance of the agreement between Laikin and DCI.  Subsequent amendments

changed the maturity dates and increased the credit limit.  To "secure" the Note, Laikin entered

into a Pledge Agreement with DCI.  Pursuant to the Pledge Agreement, Laikin agreed to deposit

210,000 shares of stock in Brightpoint, Inc. into an account held by Timothy Durham.  The stock

was not deposited into a DCI account.

From 2002 through December 14, 2009, Laikin took advances on the Note.  The parties

stipulated that from August 5, 2003 through May 2, 2006, Durham sold shares of Brightpoint

stock.  It appears undisputed that no formal foreclosure proceeding took place with regard to the

Brightpoint stock.  Laikin further testified that National Lampoon requested and obtained funds

from DCI through Laikin's line of credit.

As set forth more fully below, as a result of a sanctions order imposed by the bankruptcy

court, Laikin was prohibited from introducing any evidence that the sales of Brightpoint stock

occurring in 2004-2007 should be credited to the outstanding loan amount.

With regard to the 2003 sales, it is somewhat unclear whether the Bankruptcy Judge

concluded that Laikin reported gains from sales of pledged stock on his 2003 tax returns.  The

R&R cites to the testimony of Laikin and his accountant, who testified that Laikin did not claim

3

any gain from the sales, yet also points out that a review of Laikin's 2003 Schedule D shows that he reported long term capital gains in the amount of $77,161 with respect to the sale of Brightpoint stock.

In July of 2007, the Note was transferred to Fair Finance. At the time of the transfer, the books and records of DCI showed a balance of $14,510,844.84 in principal and $2,100,971.81 in interest. No money was received from Fair Finance for this transfer. Rather, it appears the transfer was done in an attempt to bolster Fair Finance's balance sheet by including the Note as an asset with no corresponding liability. Offering circulars issued to the public identify the Note as an asset.[2]

Ultimately, it was discovered that Fair Finance was being operated as a Ponzi scheme or in a manner similar thereto. As a result, an involuntary bankruptcy proceeding commenced. On June 16, 2010, the bankruptcy court entered an order approving an assignment agreement between DCI and the Trustee, pursuant to which all of DCI's property (including the Note) was assigned to the Trustee. This adversary proceeding followed.

During the course of discovery, the Trustee moved for sanctions and the bankruptcy court granted the motion. The following discovery responses are at issue:

- In response to an interrogatory requesting trial witnesses, Laikin objected on the basis of the work product doctrine;

---

[2]    Although the R&R notes that defendant objected to the characterization of the Note because it appeared inconsistent with terms of the Note, defendant makes no objection to Proposed Finding of Fact No. 29, which includes footnote eight. Regardless, the Court accepts this finding in that the Bankruptcy Judge credited the testimony of the forensic accountant and the Court finds no error in this regard.

4

- In response to an interrogatory requesting that defendant identify all persons with knowledge of the allegations or defenses at issue, Laikin identified Timothy S. Durham, Jeffrey W. Birk, John Weingardt, and Gary D. Salee;

- In response to an interrogatory requesting a calculation of repayment, Laikin responded, "...at least $16,753,827.41 was received from the sale of securities pledged by Laikin and deposited into an account in the name of Durham pursuant to the terms of the Note and pledge agreement...and that such amounts should be applied as payment against any indebtedness under the Note."  Laikin attached a mathematical calculation to his answer;

- Plaintiff requested that Laikin produce all documents related to: his interrogatory responses, matters raised in the complaint, defenses, transfers made to him or on his behalf pursuant to the Note, and communications between Laikin and others related to the Note;

- During his deposition, Laikin was unable to answer organizational questions about Fair Finance.  Nor could he identify several board resolutions that bore his signature.

Subsequent to these discovery requests and responses, the Trustee received permission to unseal the criminal docket related to Laikin's involvement in the National Lampoon securities fraud.  Certain sealed documents were provided to the Trustee.  Thereafter, the Trustee moved the bankruptcy court to reopen discovery and the court granted the motion.

The law firm of Blank Rome, LLP represented Laikin in the criminal case.  After the reopening of discovery, and after a number of pleadings were filed, Blank Rome eventually produced 1,300 pages of documents to the Trustee.  In addition, the Trustee issued document and deposition subpoenas to National Lampoon.  Counsel for National Lampoon responded that no documents existed because the FBI seized their documents and computer servers.  Counsel further informed the Trustee that the only employee on staff at National Lampoon who worked there at the same time as Laikin was Corazon Victoriano.  The Trustee deposed Victoriano, who testified that National Lampoon's computers were imaged–not seized–by the government.

5

Thereafter, the Trustee conducted a computer-assisted search of National Lampoon's documents and reduced the data down to approximately 65,000 documents.  Victoriano also testified that no one contacted her regarding whether she had any documents relevant to this matter, even though she would have been the appropriate person to contact.

The bankruptcy court's Sanctions Order specifically identifies three National Lampoon documents eventually obtained from National Lampoon:

(1) A 2008 email from an attorney to several individuals at National Lampoon (including Laikin) informing the directors of a document retention policy and instructing them to maintain documents and electronic files.  The email appears to have been sent as a result of the SEC investigation into National Lampoon;

(2) A March 2007 email from Laikin to Victoriano in which he requests that she print several documents.  Two of the documents are "Unanimous Written Consent[s] of the Directors of Fair Holdings" regarding related party loans and a loan amendment.  Laikin also asked Victoriano to print director consents from DCI and Fair Finance Company regarding loan amendments.

(3) A handwritten letter dated June 28, 2011, from Laikin to Victoriano.  The Order describes the letter as follows:

> The letter appears to have been written during the time that Laikin was incarcerated in a federal prison and it asks Cora to '[p]lease make sure that [illegible name] is aware of the issues and facts.'  It further instructs that '[h]e should contact and coordinate with John Weingardt on the accounting but lay out the following to him.' The information that follows appears to deal with the Promissory Note.  That letter also instructed Cora to 'immediately copy the attached and mail copies back to me along with Mark Phillips and Adam Laikin.'

> According to the order, Mark Phillips is defendant's attorney.

6

At his deposition, Laikin was asked whether he had emailed or written to anyone while in prison.  He indicated, "beyond the ridiculousness of this whole process, my attorneys, my wife, I can't think of anyone besides my attorneys and my wife outside of venting about the aggravation and ridiculousness of the process."

Victoriano testified that during Laikin's tenure at National Lampoon, Laikin primarily contacted with shareholders via email and telephone.  She further testified that Laikin used a personal laptop and Blackberry and that he used an AOL email account instead of his National Lampoon account.  In response to the Trustee's discovery requests, Laikin testified that he last used his Blackberry and personal computer in September 2010 and had no knowledge of where those devices were located.

The bankruptcy court granted the Trustee's request for sanctions.  According to the order, the bankruptcy court was troubled by three discovery matters.  First, the bankruptcy court identified Laikin's failure to identify Victoriano as a "person with knowledge" both in his interrogatory responses and at his deposition as an issue of concern.  The court concluded that "it appears that Laikin and Ms. Vicoriano communicated via email regarding possible transfers under the Promissory Note and/or disposition of pledged stock."  The court further concluded that it simply did not believe that Laikin could have forgotten about the handwritten letter he sent to Victoriano just three months prior to his deposition.  Second, the court rejected Laikin's argument that he was not obligated to produce documents in the possession of National Lampoon.  According to the court, as evidenced by the handwritten letter that Laikin sent to Victoriano, Laikin could obtain documents if he desired.  The court noted that Laikin's failure to obtain information from National Lampoon would have saved the Trustee much cost.  Further,

the court noted that the it would have been spared much delay in the outcome of this case.

Third, the court concluded that Laikin's computer and blackberry would have contained a

plethora of discoverable information and that Laikin used those devices at the time this lawsuit

was filed and up through one month prior to the initial discovery deadline.[3]  The bankruptcy

court concluded that Laikin's inability to locate these devices evidenced a willful and bad faith

failure to meet his discovery obligations.

 Based on these three discovery abuses, the bankruptcy court concluded that sanctions

were appropriate.  Defendants requested a default judgment be entered against Laikin.  The

bankruptcy court concluded that a default judgment was too severe and that it should only be

imposed as a last resort.  The court ultimately held as follows:

> Given the numerous subjects on which Ms. Victoriano shed first light, Laikin's failure to include Ms. Victoriano in response to Interrogatories 2 and 3 is inexcusable.  Also inexcusable, given the vast amount of discoverable information ultimately produced by National Lampoon and his failure to contact Ms. Victoriano to request assistance in compiling such information, is Laikin's objection to Interrogatory No. 15.  The Court finds that a calculated gamble on Laikin's part that Ms. Victoriano could be kept in the shadows and that the information obtained from National Lampoon could be kept from plaintiff for as long as possible.  His decision to write Ms. Victoriano a letter in June of 2011 to request help in obtaining information about the Promissory Note coupled with his purported failure to recall that letter during his deposition in September of the same year evinces a calculated gamble. ...[D]uring the entire course of this litigation Laikin knew or should have known that National Lampoon possessed information pertinent to the denials and defenses raised in his answer and that Ms. Victoriano had access to that information.  Notwithstanding such knowledge, he failed to identify her as a potential source of such information when asked to do so by the Trustee and never contacted her to request assistance in compiling information to fully respond to the interrogatories.  Such failure prejudiced the Trustee by delaying his access to discoverable documents and forcing him to incur substantial costs in obtaining such information.

---

[3]  This Court is somewhat confused by this conclusion because it appears that Laikin was in prison throughout nearly the entirety of this case.

8

Based on this analysis, the court sanctioned Laikin as follows:

1.  Laikin was precluded from calling Victoriano as a witness;

2.  Laikin was precluded from adducing any evidence at trial on any subject noted in any manner in the handwritten letter that Laikin sent to Victoriano;

3.  Laikin was precluded from adducing any evidence contained in the repayment calculation he provided in his interrogatory responses as it relates directly or indirectly to National Lampoon; and

4. Laikin was responsible for reimbursing the Trustee all fees and costs associated with obtaining documents from National Lampoon.

In essence, as noted by the bankruptcy court in the R&R, "Laikin was prohibited from adducing evidence regarding any alleged repayment of his obligation by virtue of pledged stock sales made during 2004-2007.  In addition, Laikin was prohibited from adducing evidence regarding National Lampoon as it relates to Laikin's calculation of the amount of advances and alleged repayments under his obligation to DCI."

At trial, the bankruptcy court allowed Laikin to offer testimony about the sale of pledged stock during 2003 only.[4]

After the close of trial, the bankruptcy court filed the R&R, which ultimately recommends that the Court enter judgment in favor of the Trustee in the amount of $32,958,018 plus interest at the default rate of 10.5% as of September 15, 2013.  Defendant filed objections to the R&R and the Trustee filed a response.  The Court will review the objections *de novo*, unless

---

[4]     It is not clear to this Court why sales of pledged stock that occurred in 2003 were allowed into evidence, while sales that occurred in 2004-2007 were excluded.

9

otherwise stated.

### **OBJECTIONS**

A.  Liability and amount owed

1.  Reliance on books and records of Fair Finance

Defendant objects to the bankruptcy court's reliance on the books and records of Fair Finance to determine the amount due on the Note.  According to defendant, the Note requires that the Court refer to the books and records of DCI – not Fair Finance– to determine the amount owing.  The Note provides that the "principal amount of the Loan outstanding from time to time shall be determined by reference to the books and records of the Lender..." and that "such books and records shall be deemed prima facie to be correct as to such matters."  According to defendant, DCI's books show an amount of "$0.00" due and owing as of August 31, 2008, which is the Note's maturity date.  The bankruptcy court concluded that resort to the books and records of DCI after July 31, 2007 would be inaccurate due to the "book transfer" that occurred on July 31, 2007.  On that date, the receivable no longer appeared on the books and records of DCI.  Rather, it was transferred to Fair Finance in an effort to inflate the assets on Fair Finance's financial statements.  In response, the Trustee argues that the only reason that DCI's books and records show a balance of zero is because of the book transfer.  The Trustee points out that DCI received no consideration for this "transfer" and DCI's records show a credit entry dated July 31, 2007, which is described as "Transfer Loans to Fair Finance."  Thus, according to plaintiff, the transference of the loan to Fair Finance means that relevant books and records became those of Fair Finance as of the date of transfer.

Upon review, the Court finds that defendant's objection is not well-taken.  The Court

10

agrees with the bankruptcy court and the Trustee that upon the "book entry" transferring the loan amount outstanding to Fair Finance, Fair Finance's books and records became those of the "Lender" for purposes of the Note.  To accept defendant's argument would mean that the book transfer–which was done for fraudulent purposes and for no consideration–wholly erased defendant's outstanding debt.  The Court finds this position untenable.  Defendant is not entitled to a windfall because of the fraud that occurred at Fair Finance.  Accordingly, the Court accepts the bankruptcy court's recommendation that the books and records of Fair Finance are the relevant records for purposes of determining the amount due and owing on the Note.

2.  Default rate

Defendant objects to the bankruptcy court's conclusions regarding the applicable interest rate.  Defendant also claims that the bankruptcy court erred in determining the base interest rate as of December 31, 2009, as well as the default interest rate.  Defendant further claims that even if the court correctly determined the base and default rates, the default rate cannot be applied post-judgment.  The Trustee argues that the court correctly determined the base and default rates.  The Trustee agrees, however, that the amount of post-judgment interest is dictated by the 28 U.S.C. § 1961.

Upon review, the Court rejects defendant's objections regarding the base and default interest rates.  As an initial matter, the Court finds that the bankruptcy court properly found that the base rate of 8.5% applies as of September 30, 2009.  Defendant acknowledges that the Note provides that the interest rate would accrue at a "per annum rate equal to 1% above the interest rate then being paid by Fair Finance...on its V-6 security deposits...."  Klein, the Trustee's expert, testified that he obtained the relevant percentage by referring to the historical V-6 rate

11

that Fair Finance had been paying.  He then added 1% to that rate to arrive at 8.5%.  It appears that 7.5% was the last interest rate paid by Fair Finance on its V-6 certificates.  Defendant does not object to the use of the particular percentages determined by Klein.  Rather, he objects on the basis that Fair Finance was not actually paying interest at this point in time.  Thus, under defendant's reasoning, no interest should be charged on the Note at all since Fair Finance was unable to make interest payments on its V-6 certificates.  The Court rejects this argument.  Any fair reading of the Note plainly provides that the parties contemplated the payment of *some* interest.  There is simply no indication that the parties intended that the Note convert to an interest free loan if Fair Finance was unable to meet its interest obligations.  The Court finds that the intent of the parties is clear and unambiguous–the benchmark to be used in calculating the interest rate under the Note is the interest rate Fair Finance was obligated to pay on its V-6 certificates.

The Court further finds that the bankruptcy court properly determined that the default rate applied as of September 1, 2008.  The Note provides as follows:

> Upon an event of default, including the failure to pay upon Final Maturity, Lender at his option may also...do one or both of the following: (a) increase the applicable interest rate on this Note by two percent (2%)....

Defendant argues that there is no evidence that DCI ever exercised its right to increase the rate by 2%.  Defendant further argues that there is no evidence that DCI ever considered the Note to be in default.  In response, the Trustee argues that he stands in the shoes of the Lender as a result of the assignment of the Note from Fair Finance to the Trustee.  According to the Trustee, he has made clear that he intends to enforce the default provision of the Note.  He further points out that, regardless of whether DCI ever considered the Note to be in default, the

12

Note expressly provides that failure to pay the entire Note balance by the final maturity date constitutes "an event of default."  Upon review, the Court agrees with the Trustee.  To the extent the Note was not paid in full as of the maturity date,[5] the default interest rate applies.  The Trustee, through the assignment, possesses all of the rights DCI held with respect to the Note. Therefore, the Trustee has the authority to increase the interest rate by 2% as expressly provided in the Note.

The Court, however, accepts defendant's objection that the default rate of 10.5% should apply post-judgment.  Post-judgment interest is governed by statute.  Accordingly, defendant's objection is well-taken.

3.  Other calculations regarding the amount due and owing

Defendant argues that the bankruptcy court erred in rejecting a "write down" of approximately $3.2 million.  According to defendant, the Note states that the "books and records" shall be "prima facie evidence" of the amount owed.  As such, because the books and records showed this write down (and a corresponding increase in the bad debt reserve of Fair Finance), the bankruptcy court should have accepted the write down and should not have increased the amount due by this amount.  According to the Trustee, the bankruptcy court

---

[5]     As set forth below, the Court finds that the bankruptcy judge erred by failing to allow defendant to present evidence of sales of the pledged securities in the years after 2003.  As such, the Court cannot say at this time whether the Note was in default as of the final maturity date.  To the extent the Note is found to be in default, the Court concludes that the default interest rate applies to the outstanding balance as of September 1, 2008.

13

properly relied on the testimony of Klein, the forensic accountant, in making this adjustment.[6]
The Trustee argues that Klein testified that there was insufficient documentation to support the
write-off.  According to Klein, Durham entered the write-off the day before the FBI raided Fair
Finance.  Because the write-down lacked adequate justification, Klein determined that the write-
down was improper and that the books and records of Fair Finance did not adequately account
for the amount due in this particular instance.

Upon review, the Court agrees with the Trustee and accepts the bankruptcy court's
recommendation with regard to the propriety of the write-down.  Although the Note provides
that the books and records of the Lender are prima facie evidence of the correctness of the
amount owed, the document does not go so far as to state that the books and records are
*conclusive* evidence.  Therefore, the bankruptcy court's recommendation that the write-off be
discounted because it is not supported by adequate justification does not violate the terms of the
Note.  This is precisely the same argument that defendant makes with regard to the credits for the
sale of the pledged securities.  The books and records do not appear to account for the sale of the
collateral.  Yet, defendant asks that the Court credit the amount due in an amount equal to the
sale of the stock.  Moreover, the Court finds nothing inherently wrong with relying on the books
and records as prima facie evidence even if a particular transaction is challenged.  The fact that
evidence related to a few transactions may rebut the prima facie correctness of the books and
records does not render reliance on the books and records for other transactions inappropriate.
In all, the Court rejects defendant's argument.

---

[6]     It appears that the only other adjustment involved three
        transactions totaling $66,000.

B.  Collateral

1.  Sanctions[7]

Defendant objects to the bankruptcy court's exclusion of repayment evidence as a result of the sanctions order.  According to defendant, the bankruptcy court improperly relied on Rule 37(d) of the Federal Rules of Civil Procedure.  Defendant  argues that the rule only applies where there is a complete failure to respond to discovery.  In addition, defendant argues that the Trustee suffered no prejudice as a result of the discovery failures.  This is especially so because the Trustee himself identified National Lampoon in his own discovery responses.  Therefore, the Trustee knew that National Lampoon may have documents and employees with relevant information.  Yet, the Trustee did not himself seek discovery directly from National Lampoon during the initial discovery period.  Defendant further argues that he should not have been required to obtain discovery from National Lampoon as it was a separate entity.  Although he may have been a shareholder, he had no control over those documents.  Rather, the Trustee should have issued a subpoena in order to obtain information from this non-party.

In response, the Trustee argues that the bankruptcy court correctly determined that defendant's serious discovery violations merited the sanctions imposed in this case.  According to the Trustee, "the Lampoon documents were replete with requests for and confirmation of advances under Laikin's Note, including over $500,000 in advances denied by Laikin in this

---

[7]     The parties note that this Court previously denied defendant's motion for leave to file an interlocutory appeal with regard to the sanctions order.  The Court concluded that the imposition of sanctions was not tantamount to a default judgment and that the standard for an interlocutory appeal was not met.  Moreover, the notice of appeal was not docketed in this Court until after the trial was underway.

15

case." Further, he points out that:

> [T]he Lampoon documents also contained enormous volumes of materials constituting Lampoon's, DCI's/Fair's accounting for the Laikin Note Transfers, including correspondence among Durham, Laikin, and Lampoon employees. The correspondence established the parties' attempts to reconcile the Lampoon and DCI books, and contains discussions regarding the shifting of entries for, among other things, the payment made to Laikin's co-conspirator in the stock fraud."

The Trustee also points out that defendant's discovery responses with regard to the timing of the sale of Brightpoint stock were inconsistent. For example, defendant and his expert indicated that no stock was sold in 2004 and that sales of stock that occurred in 2003 should have been credited to his obligations on the Note. The Trustee notes, however, that the Lampoon documents contained the handwritten letter from Laikin to Victoriano. In that letter, Laikin indicates that Brightpoint stock was sold between 2004-2007. The Trustee notes that the letter was not produced by defendant and that defendant testified at deposition that he had not sent any written correspondence to anyone. According to the Trustee, sanctions were appropriate because millions of dollars of transfers made under the Note went to National Lampoon and defendant testified at trial that Victoriano was the only person at National Lampoon that ever made any requests to DCI or Durham. Yet, defendant failed to identify Victoriano or secure the production of National Lampoon documents, as well as documents in the possession of his attorneys.[8]

Upon review, the Court finds that the bankruptcy court abused its discretion in preventing defendant from introducing any evidence related to repayment. As an initial matter, it is not entirely clear that documents in the possession of National Lampoon in any way relate to

---

[8] It is not entirely clear what theses documents disclosed. The Court notes that the attorneys resisted producing any documents, but eventually, "after lengthy motion practice," produced 1300 pages of documents.

16

Durham's sale of the Brightpoint stock in 2003-2006.  While arguably some documents at National Lampoon might relate to the stock sales, the bankruptcy court points to no document ultimately produced by National Lampoon that hurts defendant's case.  And, although generally arguing that the documents relate to advances, use of the funds advanced under the Note, and accounting documents, the Trustee also fails to point to any specific National Lampoon document that was withheld and caused the Trustee prejudice.  In fact, the bankruptcy court does not discuss *any* document produced by National Lampoon or the significance of any such document to the outcome of this case.  Although the Court certainly does not countenance the discovery abuses that occurred, the Court is deeply troubled by the severity of the sanction imposed, given the Court's lack of analysis on the issue of prejudice.

It further appears that the court took issue with the fact that defendant did not assist the Trustee in securing documents from National Lampoon.  It does not appear, however, that defendant–who appears to have been in prison at the time–had the authority over National Lampoon's documents.  Regardless, the bankruptcy court made no such finding.  Morever, the Trustee himself identified National Lampoon as a "person with knowledge."  And, in fact, in March of 2011, the Trustee issued a subpoena to National Lampoon directed to the attention of Corazon Victoriano.  Thus, Victoriano's identity was no surprise to the Trustee.  Moreover, the Trustee knew how to subpoena documents from National Lampoon and, in fact, had done so in the past.  The Trustee claims that "National Lampoon" informed him that the documents had been seized by the FBI and were not available.  The Trustee does not, however, claim that defendant himself told the Trustee or that defendant knew that someone had informed the Trustee that documents were unavailable.  The Court finds that wholesale preclusion of

17

defendant's primary defense is too severe of a sanction for the conduct at issue. There is simply no *finding* that defendant had "possession, custody, or control" of National Lampoon's documents. The fact that defendant wrote to Victoriano from prison and requested three documents related to Fair Finance does not necessarily equate to "possession, custody, or control" over all of the company's documents for purposes of Rule 34. More problematic, however, is the fact that the bankruptcy court identified no specific prejudice to the Trustee. Rather, the court noted only that the Trustee would have been spared time and expense had defendant assisted the Trustee in obtaining the National Lampoon documents.[9]

The Trustee argues that the bankruptcy court did not sanction defendant for failing to produce the National Lampoon documents. Rather, the court's observations regarding the National Lampoon documents arose under the heading "failure to identify Cora Victoriano." In that case, however, the sanction imposed is even *less* tailored to the wrongdoing because the Trustee knew of Victoriano and in fact issued a subpoena to her during the course of discovery in this case. Thus, Victoriano is not in any sense a "hidden" witness. That is not to say that defendant did not commit a discovery violation by failing to identify her as "person with knowledge." Rather, the Trustee's awareness of Vicotriano during the pendency of discovery simply goes to the severity of the sanction to impose. Here, the Court finds that an order precluding defendant from relying on Victoriano at trial would be well within the court's discretion. Precluding defendant from introducing any evidence of repayment from the 2004-

---

[9]     The Trustee argues that it is "absurd" to conclude that the Trustee suffered no prejudice. The Trustee points out that he spent years litigating this case without documents that should have been disclosed to the Trustee at the start.

18

2006 sales of pledged securities, however, amounts to an abuse of discretion absent a showing of prejudice.

The bankruptcy court found, "[a]lso inexcusable, given the vast amount of discoverable information ultimately produced by National Lampoon and his failure to contact Ms. Victoriano to request assistance in compiling such information, is Laikin's objection to Interrogatory No. 15." Interrogatory No. 15 requested that defendant illustrate by mathematical calculation each act of repayment. Defendant did so and attached a mathematical calculation showing that at least $16.7 million was received by DCI and Durham as a result of the sale of the pledged securities. Defendant further testified that he searched his computer and office and provided all responsive documents. The Court finds that for the same reasons set forth above, precluding defendant from adducing any evidence related to Interrogatory Request No. 15 "as it relates either directly or indirectly" to National Lampoon far exceeds the wrongdoing. Again, the Trustee knew of Victoriano and was familiar with defendant's role at National Lampoon and, in fact, had previously subpoenaed documents from National Lampoon. Other than delaying this matter, there simply appears to be no prejudice to the Trustee from these discovery failures on the part of defendant.

The most troubling aspect of defendant's discovery abuses is the disposal of his blackberry and laptop. Defendant testified that he used his email address in making requests for advances under the Note. Yet, even in the face of a litigation hold, defendant "disposed" of these devices, which undoubtedly contained relevant and responsive information. The difficulty, however, is that it does not appear that the bankruptcy court or the Trustee places much significance on this failure. The sanctions order simply notes that defendant failed to maintain

19

the data on the devices and that it is suspicious that he used the devices during the litigation and then claimed to have no knowledge as to their location.[10] The R&R, when summarizing the discovery failures, does not mention the loss of data from the devices. And, although the Trustee mentions the lost devices in his response to the objections, he does not indicate how the loss caused any prejudice. For example, it is not clear whether the Trustee was able to obtain the data on defendant's blackberry and laptop from National Lampoon's server or directly from the email provider. Again, although defendant's conduct is certainly sanctionable, there is simply no indication (other than lost time and resources) that the discovery failures in this case caused such prejudice so as to warrant precluding the vast majority of defendant's defenses at trial.

The bankruptcy court further determined that defendant would be "precluded from adducing any evidence at trial on any subject noted in any manner" in a letter handwritten by Laikin to Victoriano that was inconsistent with his discovery responses both before and after the date of the letter. Although the bankruptcy court mentions the letter in the facts section of the sanctions order and indicates that defendant denied having written any correspondence from prison (other than to his wife and attorneys), the bankruptcy court wholly fails to address the significance of the letter. In fact, the bankruptcy court noted three "troubling" discovery failures in its Order, yet the letter was not included among the three failures. Moreover, there is absolutely no mention of the letter or its significance in the analysis section. Yet, it appears that the broadest discovery sanction arose as a result of this letter as the bankruptcy court precluded

---

[10]     The timing of defendant's incarceration is not set forth in the R&R. Thus, it is unclear whether he was in prison and utilizing the devices or whether he went to prison after he stopped using the devices.

defendant from "adducing any evidence at trial on any subject noted in any manner in [the letter.]"  By its terms, this essentially precluded defendant from introducing any evidence at all related to the Note.   Absent at least some analysis on the part of the court, such a broad and overreaching sanction is impermissible.

Plaintiff also objects because the sanctions Order amounted to a moving target and defendant was not able to determine even through trial what evidence he was permitted to introduce.  For example, defendant was initially precluded from introducing any evidence related to the Note.  That sanction was ultimately narrowed.[11]  In response, the Trustee argues that the sanctions order was interlocutory in nature and, therefore, the bankruptcy court was permitted to narrow the scope of the order at any time.  Upon review, the Court agrees with the Trustee.  The bankruptcy judge had the authority to narrow the scope of the sanctions order and there was no abuse of discretion in so doing.

In sum, based on the nature of the discovery abuses that occurred in this case and the lack of actual prejudice identified by the bankruptcy court, the Court finds that the bankruptcy court abused its discretion by prohibiting defendant from introducing repayment evidence from 2004-2007 and evidence regarding National Lampoon as it relates to defendant's calculations of amounts due under the Note.[12]  The Court also rejects the bankruptcy court's award of fees.  The court indicates that defendant should be responsible for all of the fees associated with the

---

[11]     It appears that the Trustee requested a narrowing of the scope of the sanctions order.

[12]     The parties dispute whether the bankruptcy court had the authority to issue sanctions under Rule 37(d).  The Court need not reach this issue because even assuming the court had the authority, this Court finds that the abuse of discretion standard is met.

Trustee's acquisition of documents from National Lampoon.  The court, however, did not make a determination that defendant had "possession, custody, or control" of the National Lampoon documents.  Accordingly, the Court declines to accept this recommendation.

Further, in light of this Court's finding with respect to the exclusion of most of defendant's repayment evidence, the Court accepts defendant's objection to the bankruptcy court's determination that it was "undisputed" that no proceeds were applied or that defendant "presented no evidence," as those phrases appear in ¶¶ 9, 12, 13, 33, 34, 35, and 36.

2.  Repayment

Although the bankruptcy court did not allow defendant to introduce evidence of repayment after 2003, the court did address whether sales of Brightpoint stock occurring in 2003 could be credited toward the outstanding balance on the Note.  In so doing, the court reviewed the language in the Pledge Agreement.  The agreement provides as follows:

> 6.  Remedies.  Upon the occurrence of an Event of Default, the Lender shall have all the rights, remedies and options in and to the Pledged Securities of a secured party under the Uniform Commercial Code as enacted in Indiana....  In exercising any such remedies the Lender may sell all or any portion of the Pledged Securities as a unit, even though the price obtained may be in excess of the amount remaining...
>
> 7.  Application of Proceeds.  The proceeds of any sale of all or any part of the Pledged Securities, and any other cash at the time held by the Lender under this Pledge Agreement, shall be applied by the Lender in the following order:
>
> ***
>
> > b. to the payment of any other of the Obligations in such order as the Lender may determine...

According to the bankruptcy court, there was no evidence that the lender, *i.e.*, DCI, ever "held" the proceeds from the sale of Brightpoint stock.  Moreover, there is no indication that DCI ever determined that an "event of default" occurred or that DCI instituted foreclosure

22

proceedings as required under Indiana law.  The bankruptcy court further determined that

Durham acted as an agent for Laikin when selling the stock.

Defendant objects to these conclusions.  According to defendant, basic agency law

renders the bankruptcy court's determinations erroneous.  Defendant argues that Durham was the

managing member of DCI and, therefore, he possessed actual authority to act on behalf of DCI

with regard to defendant's repayment of the Note.  Defendant points out that under the operating

agreement, Durham exercised all powers of DCI and all of his decisions within the scope of his

authority were binding upon DCI.  Defendant further argues that even if Durham did not possess

actual authority with regard to the sales of Brightpoint stock, he possessed apparent or inherent

authority.  According to defendant, whether DCI ever "held" any proceeds in its own bank

accounts is irrelevant because it is undisputed that Laikin did precisely what DCI's pledge

agreement called for –that is– he transferred Brighpoint stock to Durham's personal account.

Thus, at that point the stock and any corresponding proceeds were in fact held by DCI through

Durham, its authorized agent.

In response, the Trustee argues that the bankruptcy court correctly held that the Pledge

Agreement permits DCI to sell the stock in a foreclosure sale only after an event of default

occurs.  Because it is undisputed that no foreclosure sale occurred, DCI was not obligated to

credit plaintiff's outstanding balance as a result of the sale of Brightpoint stock.  In addition, the

Trustee argues that none of the evidence suggests that Durham was acting as DCI's agent in

selling the stock.  Rather, according to the Trustee, the bankruptcy court correctly determined

that Durham was Laikin's agent.  It does not appear, however, that the Trustee disputes that

Durham possessed actual authority to act on DCI's behalf.  ("Laikin's arguments fail because

they improperly conflate Durham's authority to act for DCI with the actual exercise of that authority.")  Rather, the Trustee argues that when Durham sold the Brightpoint stock, he did not do so as an agent of DCI, although he theoretically possessed the authority to do so.  Rather, because the Pledge Agreement prohibited DCI from selling the collateral absent an event of default, Durham could not have been acting as an agent of DCI.  In addition, the Trustee argues that to the extent Durham acted as a dual agent, Laikin should bear the loss for any misappropriation.

Upon review, the Court finds that the bankruptcy court did not address whether Durham was DCI's agent when he sold the sales of Brightpoint stock.  As such, the Court cannot accept the recommendation that Durham was acting solely as Laikin's agent at the time of sale.  Here, DCI expressly agreed pursuant to the Pledge Agreement that the collateral would be held in Durham's personal account.  Thus, any sale by DCI–through foreclosure or otherwise–would have to be accomplished by Durham.  There is simply no way DCI as an entity would have access to the stock unless Durham became involved.  As such, it appears highly improbable that Durham acted solely as *Laikin*'s agent in selling the stock.  To the extent Durham acted as DCI's agent in selling the stock, DCI undoubtedly "held" the proceeds because DCI directed the stock to be held in Durham's account in the first place.  Thus, any proceeds would have been placed in the same account, *i.e*, the account DCI directed that the collateral be placed.  Although this is undoubtedly an extremely unusual transaction, the Trustee obtains no greater rights than those held by DCI.  Here, DCI chose to use Durham's personal account (and thereby Durham) with respect to transactions involving the collateral.

In addressing this issue, the bankruptcy court held as follows:

24

In this case, Laikin never made an inquiry as to the balance of his loan, payments credited toward the loan, or the sale of stocks transferred to the Durham Account. He had no agreement with Durham regarding the allocation of proceeds from any brokerage account. He does not know whether Durham sold stock in 2003, he does not know what happened to the proceeds from the sale of stock by Durham in 2003. In such a circumstance, the Court finds he failed to exercise common sense and judgment. He continued to draw funds from his line of credit even after he reported to the Government that Durham was running Fair Finance, the source of DCI's funds, as a Ponzi Scheme. He cannot credibly assert that the law should view him as the party the law should protect as between himself and the Debtor's estate.

This analysis, however, does not address a fundamental issue. Namely, there is no discussion as to whether Durham acted as DCI's agent.[13] Similarly, although argued now by the Trustee, there is no discussion of whether Durham acted as a dual agent and the effect of any such dual agency on the analysis.[14] These threshold issues are critically important to the conclusions reached by the bankruptcy court. For example, the court determined that DCI never "held" any proceeds from the sale of Brightpoint stock. As defendant correctly notes, however,

_____

[13]    The bankruptcy court relies on cases in which an innocent principal is found to be not liable for acts in which its agent exceeded the scope of his authority. Those cases, however, have no bearing on this case. It is important to note that DCI was not an "innocent" principal. Rather, DCI was by all accounts run by Durham to facilitate a massive fraud. The bankruptcy court presumes that by and between the debtor's estate, the Court should protect the estate over the interests of Laikin. However, here, the analysis must focus on the relationship between the parties at the time the transaction occurred. Thus, the Court cannot say that it should protect *DCI*'s interest over those of Laikin in determining whether Durham acted as DCI's agent.

[14]    The court concluded only that Durham was Laikin's agent with regard to the collateral. The bankruptcy judge noted that Laikin directed Durham to sell the stock and apply the proceeds to the Note. The court then summarily concluded that "Durham, acting as Laikin's agent sold the Brightpoint stock, and apparently converted the proceeds."

25

if Durham acted as DCI's agent in selling the Brightpoint stock, then DCI's agent –and therefore DCI– "held" the funds.  Thus, a determination of whether Durham acted as DCI's agent is necessary for a proper resolution of several issues in this case.

To the extent the Trustee is arguing that DCI should not be required to credit the amount due under the Note because it never foreclosed on the Brightpoint stock, the argument is rejected.  In essence, the Trustee asks this Court to find that a lender who wrongfully sells collateral should receive a windfall from its improper action[15] in that the borrower must nonetheless repay the face value of the Note with no consideration given for the value of the collateral.  The Court rejects this argument.

This Court also rejects the Trustee's argument that Durham was *necessarily* acting as an agent of Laikin in selling the stock since the Pledge Agreement prohibited DCI from taking such action.  In other words, an agent cannot be acting as an "agent" if he takes actions inconsistent with certain documents.  This argument is simply wrong.  A business may decide it is financially prudent to breach a contract.  And, that decision may be well within the scope of the agent's authority.  Thus, the fact that the Pledge Agreement (or possibly Indiana law)[16] authorized the sale of the collateral only in a foreclosure sale upon an event of default does not mandate a finding that Durham was not acting as DCI's agent.

---

[15]   Again, this analysis may change depending on whether Durham acted as DCI's agent.  To the extent an agency relationship is found to exist, then DCI wrongfully sold the collateral.

[16]   Given this Court's conclusions regarding the need for the bankruptcy court to address ths issue of agency, the Court need not reach defendant's argument that pursuant to Indiana law, a secured creditor need not institute foreclosure proceedings in order to sell collateral.

26

C.  First material breach

Defendant argues that the bankruptcy court erred in refusing to allow defendant to argue the doctrine of "first material breach."  Pursuant to the "doctrine of first material breach, '[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract.'"  *Gallagher v. Southern Source Packaging, LLC*, 564 F.Supp.2d 503, 508 (E.D.N.C.,2008)(*quoting Licocci v. Cardinal Assocs., Inc.*, 492 N.E.2d 48, 52 (Ind.Ct.App.1986)).  The bankruptcy court concluded that the doctrine of first material breach is an affirmative defense and that defendant did not raise the defense until the start of trial.  As such, it was not timely raised.  The Trustee argues that the bankruptcy court correctly ruled in this regard.

Upon review, the Court agrees with the Trustee and concludes that the bankruptcy court did not err in finding that the doctrine of "first material breach" is an affirmative defense. Because defendant did not raise this issue until just prior to the commencement of trial, defendant waived any argument in this regard.  Although defendant argues that the doctrine is not an "affirmative defense," he cites no case law so holding.  Rather, he cites generally to cases discussing the doctrine, but no case holding that it is not an affirmative defense.  On the other hand, the Court finds that case law supports the conclusion that the doctrine is an affirmative defense.  *See, e.g., BKCAP, LLC v. Captec Franchise Trust 2000-1*, 2010 WL 1222187 (N.D. Ind. March 23, 2010)(applying Indiana law and allowing amendment to answer to allow defendant to assert the affirmative defense of first material breach);  *Norfolk Southern Railway Co. V. E.A. Breeden*, 756 S.E.2d 420 (Va. 2014)(noting that parties raised affirmative defense of

27

"first material breach" ); *Fraser Trebilcock Davis & Dunlap PC v. Boyce Trust 2350*, 304

Mich.App. 174, --- N.W.2d ---, 2014 WL 485919 (Mich.App. 2014)(same);  *Mathews v. PHH*

*Mortg. Corp.*, 724 S.E.2d 196 (Va. 2012)(noting that "first material breach" doctrine operates as

an affirmative defense).  As such, the bankruptcy judge correctly ruled that defendant is not

permitted to assert the affirmative defense of "first material breach" on the eve of trial.[17]

    D.  Equitable defenses

    Defendant objects to the bankruptcy court's conclusion that defendant has "unclean

hands" and, therefore his equitable defenses are barred.  According to defendant, the bankruptcy

court improperly relied on the indictment in determining that defendant used the proceeds from

the Note to engage in securities fraud.  The defendant further objects to the court's conclusion

that defendant knew of the fraud perpetrated by Durham at Fair Finance, which was a subsidiary

of DCI, yet continued to accept funds from DCI.  In response, the Trustee argues that the

evidence was sufficient to establish that defendant acted with unclean hands.  According to the

Trustee, the bankruptcy court properly relied on the indictment in determining that defendant

used the proceeds from the Note to engage in securities fraud.  Similarly, the Trustee argues that

a wealth of evidence exists showing that defendant knew that Fair Finance was operated as a

Ponzi scheme, yet he continued to obtain funds from DCI.

    Upon review, the Court rejects the objections raised by defendant.  As an initial matter,

---

[17]    The Court is careful to note that this ruling does not preclude
defendant from arguing that he is entitled to a credit for the sale of
the Brightpoint stock.  Rather, the ruling prevents defendant from
arguing that any breach committed by DCI in failing to apply the
proceeds from any sale results in a complete defense to *all*
repayment.

the Court finds no error in the bankruptcy court's reliance on the indictment.  As the Trustee

points out, Fed.R.Evid. 803(22) provides that the following is excluded from the hearsay rule:

> (22) Judgment of previous conviction.  Evidence of a final judgment of conviction if:
>
> (A) the judgment was entered after a trial or guilty plea, but not a nolo contendre plea;
>
> (B) the conviction was for a crime punishable by death or by imprisonment for more than a year;
>
> (C) the evidence is admitted to prove any fact essential to the judgment; and
>
> (D) when offered by a prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.
>
> The pendency of an appeal may be shown but does not affect admissibility.

Here, the Trustee introduced evidence of a final judgment in the case and it is undisputed

that defendant plead guilty to securities fraud.  The indictment expressly alleged that defendant

agreed to pay Eduardo Rodriguez approximately $60,000 to help create artificial volume in

National Lampoon stock.[18]  Under Sixth Circuit law, an indictment is not hearsay if it relates to a

conviction.  *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006)

(The...records, including the indictments, are admissible under Rule 803(22), which excepts

judgments of previous convictions from the general ban against hearsay.").  Defendant argues

that the bankruptcy court did not determine whether the evidence that was admitted was

"essential to the judgment."   The Court finds, however, that a plain reading of the indictment

shows that the payment of money to Rodriguez was essential to the crime of securities fraud

based on artificial price inflation.  Accordingly, the bankruptcy court's reliance on the

---

[18]  The Court further notes that the government relies on this allegation in its change of plea memorandum filed in the securities fraud case.  *See*, 2:08 CR 733 (E.D.Pa. 2008) at ECF 96.

29

indictment to establish the doctrine of unclean hands was not erroneous.  The bankruptcy court

accepted this evidence over the testimony of defendant and the Court sees no reason to disturb

the bankruptcy court's credibility determinations.  Therefore, the bankruptcy court did not err in

concluding that defendant is prohibited from relying on equitable defenses as a result of his own

"unclean hands."  As such, the Court need not reach whether the equitable defenses are also

barred as a result of defendant's knowledge of the fraud committed through Fair Finance.

E.  Right to a jury trial

Defendant argues that issues of credibility should have been tried before a jury because

even though the Note includes a jury trial waiver, the waiver is expressly between defendant and

DCI.  In response, the Trustee argues that the Note was validly assigned and, therefore, the

Trustee obtained all rights held by DCI, including the jury trial wavier.

Upon review, the Court accepts the bankruptcy court's recommendation that the Trustee

is able to enforce the jury trial waiver as a result of the assignment of DCI's property to the

Trustee.  As an initial matter, the Court rejects any argument that DCI received less than a full

assignment of the Note.[19]  Further, the Court finds that as a result of the assignment, the Trustee

is able to enforce the waiver.  "It is clear that the parties to a contract may by prior written

agreement waive the right to jury trial. ....[T]he question of right to jury trial is governed by

---

[19]     Defendant argues that the bankruptcy court determined that the
        "receivable for the Note was transferred to the Trustee."
        According to defendant, the jury trial waiver was not part of the
        "receivable."  Defendant, however, ignores Paragraph 80 of the
        R&R, which expressly determined that, "the Court entered an
        order approving a compromise and assignment agreement between
        DCI and the Trustee pursuant to which all of DCI's property,
        including th Note, were assigned to the Trustee."

federal and not state law." *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir.1985).

The test for determining whether a waiver is to be upheld is whether the party to be charged

made the waiver "knowingly and voluntarily." *Id*. at 756.   When a contract contains an express

jury waiver provision, the "objecting party [has] the burden of demonstrating that its consent to

the provisions was not knowing and voluntary." *Id*. at 758.

Here, defendant does not appear to dispute that initially he "knowingly and voluntarily"

agreed to waive his jury trial rights.  Indeed, the provision is in all capital letters and

conspicuously placed right above the signature lines of the Note.  Nor does defendant object that

the claims at issue fall outside the broad waiver contained in the Note.  Rather, defendant's only

argument is that the Note was assigned to the Trustee and that defendant waived his jury trial

right only as to claims brought by DCI.  Defendant's argument, however, ignores the basic tenets

of assignment law.  Here, defendant does not argue that the Note itself is not assignable.  Rather,

defendant argues only that the jury waiver provision cannot be assigned.  Yet, "[a]n unlimited

assignment of any contract, including a promissory note, conveys to the assignee ALL rights and

obligations to the assignor."  *Raceday Center, LLC v. RL BB Financial, LLC*, 2012 WL 3284287

(E.D. Tenn. Aug. 10, 2012).  Defendant offers no law supporting his theory that a jury waiver

provision is not assignable where the underlying contract has been assigned.  As such, defendant

fails to establish that his consent to waive a jury trial as to all claims arising under the Note was

not "knowing and voluntary" as it relates to successors and assigns.  The Court finds no error in

the bankruptcy court's determination that defendant waived his right to a jury trial.

F.  Issues not litigated

Defendant objects to certain recommendations made by the bankruptcy court that he

claims have no bearing on this case.  For example, defendant claims that there is no evidence to support the conclusion that he "was a knowing participant in the Fair Finance fraud scheme while he was a director of Fair Finance."  Nor is there support for the conclusion that "the trial record as a whole supports the conclusion that [at] least from mid-2006 on, [defendant] used his DCI line of credit in a manner that imposed a wilful and malicious injury on Fair Finance."  The Trustee argues that sufficient evidence exists to support these determinations.

Upon review, the Court declines to accept these recommendations at this time.  In that a new trial will be required in any event, and because it is not apparent that these determinations bear on the merits of the Trustee's claim, the Court finds that it is simply not necessary to reach these issues.

### CONCLUSION

For the foregoing reasons, the R&R is ACCEPTED in PART and REJECTED in PART. In addition, for the foregoing reasons, the Court does not accept the sanctions award.

IT IS SO ORDERED.


/s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
Date:   8/01/14                              United States District Judge

32